**McKEE, Admrx., v NEW IDEA, Inc.**

Ohio Appeals, 3rd District,
Mercer County.

No. 472. Decided Jan. 17, 1942.

B. A. Myers, Celina, O. J. Myers, Celina. for plaintiff-appellee.

Hedges, Hoover & Tingley, Columbus, Kenney & Hinders, Celina, for defendant-appellant.

## OPINION

By GUERNSEY, J.

This is an appeal on questions of law from a judgment of the Court of Common Pleas of Mercer county, Ohio.

The action was filed in the Common Pleas Court of Mercer county Ohio, by Mabel McKee as administratrix of the estate of Ray McKee, deceased, against New Idea, Incorporated, to recover for the alleged wrongful death of plaintiff's decedent from an occupational disease known as silicosis, averred to have been contracted by said decedent while employed by the defendant company, and by reason of its negligence.

This action was filed after the decision of the Supreme Court in the case of **Triff v National Bronze and Aluminum Foundry Company, 135 Oh St 191,** wherein that court held that the Workmen's Compensation Act did not protect employers against actions for damages resulting from non-compensable occupational diseases.

Upon the trial of the case the jury returned a verdict in favor of plaintiff in the amount of fifteen

thousand dollars. The defendant filed motion for judgment notwithstanding the verdict, and for new trial, both of which were overruled by the trial court. Whereupon judgment in said amount was entered by the trial court on the verdict of the jury.

It is from this judgment that this appeal is taken.

The case was submitted upon the amended petition of the plaintiff and the answer thereto of the defendant.

It is alleged in the amended petition that plaintiff is the duly appointed, qualified and acting administratrix of the estate of Ray McKee, deceased. That Ray McKee, on and prior to March 15, 1936, was employed by the defendant as a molder in the factory owned and operated by the defendant at Coldwater, Ohio. That the molding room of defendant's plant was wholly inclosed, was without natural or artificial ventilation and was not equipped with exhaust fans, blower system or any other device or means designed to collect and remove dust from the air in said room. That said decedent was not provided by defendant with any device to be worn over his mouth and nose to prevent his inhalation of dust. That said decedent was exposed to silica dust in an amount harmful to health, which condition was known or should have been known by defendant but was unknown to plaintiff's decedent, and that as a result he contracted silicosis from which he died on June 3, 1938.

It is further alleged that said decedent was continuously and constantly exposed to silicon dioxide or silica dust in quantities injurious to his health.

The specific acts of negligence charged against the defendant are:

First. Failure to furnish a safe place to work.

Second. Failure to warn plaintiff's decedent of the danger in being exposed to silicon dioxide.

Third. Failure to provide safety devices for the protection of plaintiff's decedent while working.

It is further alleged that plaintiff's decedent, Ray McKee, at the time of his death was forty-three years of age and had an earning capacity of thirty-five dollars per week; that he left Mabel McKee, his widow, surviving him, and Margaret McKee, a minor daughter of the age of thirteen years, who were dependent upon him for support; and that said child was also dependent upon him for education; and left surviving him, another daughter, Luba Katterheinrich, who is now married; all of whom have been injured by the death of said Ray McKee as a proximate and direct result of the negligent acts aforesaid of the defendant company in the sum of twenty-five thousand dollars.

In its answer to the amended petition the defendant admitted that plaintiff is the administratrix of the estate of Ray McKee; that he died on or about June 3, 1938, and that he had been employed by it in its Coldwater factory. That plaintiff's decedent had not been provided with any mask, respirator or other device to be worn by him over his mouth or nose during working hours; that such devices were not known for use of molders in factories of the character of that of the defendant; that such devices were not in common use with such employment and that the use of such a device would have interferred with the efficient operation of the foundry of the defendant, and that such devices would have been useless and of no benefit to plaintiff's decedent or any of the other employes of its foundry.

In its answer the defendant fur-

ther admitted that the decedent while employed as a molder, used molding sand; that at the time of his death he was forty-three years of age, and that he left surviving him those persons named in the amended petition.

The defendant denied every other allegation in the amended petition.

At the trial, plaintiff offered the testimony of six witnesses who testified generally as to the method of molding employed in the foundry of the defendant, the materials used, the manner of pouring the metal into the molds, and the condition prevailing in the foundry as to ventilation. These witnesses were George H. Ludeke, Joseph P. Wenning, Ed. Smith, Christ Weitzel, Mike Lefeld and Henry Hilskamp.

All of these witnesses described the process of molding employed in the foundry; they told how the wet or moist molding sand was put into the flasks; that they used parting compounds, either a fine powder or liquid; how the molding sand was tamped around the pattern and the pattern withdrawn, and how after the completion of the mold was then put on the molder's floor ready to have the molten iron poured into it. They all testified to varying degrees of dust incident to and arising from the operation incident to the making of the molds; how the hot iron was poured by the molders into the molds, and how after the metal was given several minutes to cool they dumped or turned the molds over and continued the pouring of the metal. The witnesses testified to varying degrees of the prevalence of dust and steam which arose and were prevalent during the pouring of the iron and the overturning of the mold.

George Ludeke testified that he had been employed by defendant as a molder and that molders handled from six hundred pounds to sixteen hundred pounds of iron per day according to the pattern being used and that the number of men employed in the foundry during the period of his employment ran from nineteen to twenty-one. He further testified: The foundry room was approximately eighty by sixty feet, although he was not definite about this; and during the period of his employment Ray McKee worked on the west side of the foundry right up against the wall, and there was a window about four or six feet back of the place where McKee worked, and he thought there were three windows along the west wall. There was also a door and outway where molders came through with their sand and stuff.

An hour or so after molds were dumped the castings were jerked out of the sand and were taken into the grinding room where they were put in rattlers and cleaned. New sand was then put with the molding sand and replaced that carried away with the castings.

The top of the foundry roof is what is known as saw tooth construction and there were windows in one face of each tooth running clear across the foundry; that a few of the windows were open but the rest wouldn't open; that a few of them would open around the floor he was working on and that some would open around other floors. These floors would run about fourteen feet square; that the floor on which each molder worked was supposed to be laid out about the same and that the word "floor" as he used it, means the space each molder has in which to do his work. The molding sand was damp at the time he worked with it and it couldn't be used in making molds unless it was damp.

There was a steam heating unit

in the foundry but it didn't furnish any heat.

The parting compounds used were of two colors, one being yellow and one being white, the yellow being commonly known as talc.

Since he had worked in the foundry it had a cement floor and that on this floor there always was the sand used for molding purposes; that this cement floor covers the whole room and is divided up between the men, each man having a certain amount of space and each space being from fourteen to sixteen feet square. Dividing one working space from another is a path which is all dust and all dirt which accumulates there during the day.

The windows in the foundry room are glass and are hinged and fixed on an apparatus from which a rope hangs which it is necessary to pull in order to open the windows, but most of the time only about one half of the windows would open; and that a part of the time the windows wouldn't open and were not opened. In the winter time they wouldn't have them open because it would be too cold and because they couldn't open them; and that in the summer time when the windows were open a breeze many times would come through the windows and blow in the foundry room and raise the dirt off the floor, and raise a lot of dust. The heating unit was in the way of a blower and was regulated by a fan; when the fan ran it would help raise the dust and circulate it in the air, and there was no connection to carry the dust outside of the room.

Joseph P. Wenning testified: The foundry room was eighty by one hundred feet, and that he knew Ray McKee and had worked with him at New Idea, Incorporated, and had worked for the company from 1916 until December 31, 1937. Ray McKee started to work sometime in 1918; that he worked in the same room with Ray McKee on the same section of the floor; first the floor was a ground floor but afterwards a cement floor was put in in the falls of different years, it taking about three years to put the whole floor in. There was a sand pile in each section of the floor in which a molder worked. Most of the time during his employment there were eighteen molders working in the foundry, each of them handling from eight hundred pounds to two thousand pounds of molten metal per day, depending on the weight of the patterns and the size of the castings. Each molder had his own pile of sand. The sand used by the molders had to be damp when used and it was sometimes necessary for them to wet the sand in preparation for use. The sand was never wholly changed, always some new sand being added from time to time.

The foundry room was open to a grinding room. In the foundry room was parting dust, some sand dust and some grinding room dust. The door from the grinding room to the foundry was usually open and if the wind happened to hit it right, most of the grinding room dust was blown into the foundry.

The company formerly had a couple of coke stoves in the foundry room but in later years put in some steam heat; there was a fan in the heater; lots of times there wasn't any steam turned on; the fan and the heater would circulate the air around the room but there was no outside connection to that to draw the dust out of the room. The room was never swept or cleaned up to remove the dust.

Dust and steam arose when a mold was dumped.

When a molder was working

there in the heat,—when he was finishing up, when he had completed the pouring of all his metal, he was pretty well exhausted and breathed through both his mouth and his nose.

There were three windows in the west of the building when he started to work there in 1919 and there were about an equal number to the east. The foundry has a saw tooth roof, and the windows on the roof are fastened with a rope for opening the windows on top. If there was an east wind there was plenty of air from the windows in circulation but if the wind was from the south or west the workers in the foundry wouldn't get any air from the windows and there wouldn't be any ventilation through the roof windows. In the winter time, lots of times the windows were nailed shut or frozen shut; and at times the ropes were torn off.

He worked eight hours a day molding and an hour and a half extra in pouring, about nine and a half hours per day.

The company did not have any arrangement to carry the dust out of the building as long as he was there.

McKee earned an average of about five dollars a day. He was about five and a half feet tall and weighed about one hundred and seventy pounds. He was in good health and put out a good big full day's work. He and McKee worked in the same room together for many years and McKee did as much or more work than he did.

Christ Weitzel testified:—The number of men employed in the factory varied from fifteen to twenty and the weight of metal handled by each of the molders varied from one thousand to thirteen hundred pounds, and the number of molds made by the molders would average from seventy-five to eighty and sometimes ninety or ninety-two molds.

He worked in the foundry at various times during the time Ray McKee worked there.

The sand used in each of the molds would be around between fifty and sixty pounds in weight and maybe heavier. If the sand was not wet enough the molders would wet it down during the work.

That there was a room adjoining the foundry room, which was called a grinding room where the castings were rattled to clean off the sand on them. That there was an ordinary door between the foundry room and the grinding room. The castings were removed by the night men each night from the foundry room to the grinding room on trucks operated on tracks.

There were windows in the roof which had ropes on them and they were always ready to open but that half of the time the molders didn't want them open in the winter time as it was too cold.

Mike Lefeld testified: He made ninety molds a day and handled about seventeen hundred and forty pounds of iron in connection with the molds he was making. The molders kept using the sand over and over again but added new sand to it if it was needed, and that the sand was quite wet when being used by the men when making molds.

The size of the blower fan in the foundry was five or six feet wide and was used in the winter time to circulate heat. It was also used some in the summer months to circulate and cool the air. The windows were not open in the winter time except at pouring time (which occurred during the last hour and a half of the working day). The windows were opened at pouring time in the winter only in the event that the weather was so cold that the steam don't blow

down. The steam came from the molds when they were dumped and it was then that the windows were opened to let out the steam if it was not too cold.

He had on his floor on an average from twenty to twenty-five wheelbarrows of sand. A molder has control of the sand he uses and if he wants to renew it he can get some new sand. During the course of the average week he put from two to three wheelbarrow loads of new sand on his floor. The sand a molder is required to use goes out with the castings and the sand is cleaned off in the casting room. In making molds he had to screen some sand and had to put some of this parting in and shovel the sand into every one of them and pound it down or tamp it down into the mold.

Henry Hilskamp testified: That he worked in New Idea, Incorporated, foundry and had worked there about twenty-six years. He ceased working at the foundry for about two years but came right back after the war and has worked at the foundry continuously since that time. He knew Ray McKee and worked in the same room with him and did the same kind of work. The highest number of men he knew of being employed in the foundry at one time was forty-one, and the average weight of the metal handled by the men daily ran from eight hundred to a thousand pounds, sometimes a little bit more, but if the castings were heavy it would run to fifteen hundred pounds. Maybe two or three times a year all the sand is taken out and new sand put in. The sand gets rotten and they take it out and they get new. It wears out.

Fans were put in the foundry room about six years ago. There were no fans in there before that time. Each man had control of the windows over his own floor. He could have them open or closed just as he wanted.

Plaintiff offered in evidence, Exhibits A to H, inclusive, which are X-ray films of the chest of Ray McKee. Exhibit A was taken by Dr. Gibbons. Exhibits B, C, D, E, F and G are three pairs of stereoscopic films taken at various times at Lima District Tuberculosis Hospital, commencing July 28, 1935, and Exhibit H is a flat film taken at the Caylor Nickel Clinic of Bluffton, Indiana, in 1938.

Mabel McKee, administratrix of the estate of Ray McKee, and his widow, testified: That Ray McKee started to work at The New Idea in the year 1918 and continued in such employment until the latter part of February or the first of March, 1936. He quit because of ill health. Finally he completely quit work for The New Idea, Incorporated, in February of 1936. There were intervals before that in 1935 when he was not at work because of his health. He was suffering from ill health in 1935.

When Ray McKee first entered the employment of the defendant he was a stout, robust man about five feet eleven inches in height and one hundred and eighty-five to one hundred and ninety-five to two hundred pounds in weight.

Prior to his illness in 1935 he had not suffered from pneumonia and had not had any serious trouble and hadn't had any trouble with his lungs or respiratory organs.

He did not have any other employment than his employment at the foundry of New Idea, Incorporated, and from 1918 up until the time of his death he had no other employment, except that during the depression he worked on a farm.

When he became ill in 1935 his trouble was that he just couldn't get his breath. He always ran a subnormal temperature. She took

his temperature at different times and it was always subnormal. In the top part of his lungs from his bronchial tubes down or up he couldn't get his breath. He visited various doctors in an effort to ascertain what his trouble was, and X-ray pictures (being the pictures above mentioned) were taken, and that she accompanied her husband on these visits and was present each time the X-ray pictures were taken.

In addition to Mrs. McKee, several other witnesses testified that they accompanied Mr. McKee on some of his various visits to physicians and were present at various times when some of the X-ray pictures were taken.

Shortly after the X-ray picture had been taken at the Caylor Nickel Clinic at Bluffton, Indiana, she and her husband called on Mr. Henry Synck at his private office and Mr. McKee told Mr. Synck in her presence that he had been advised he had silicosis, and asked Mr. Synck "What kind of sand have you got here?", to which Mr. Synck replied, "I don't know the composition of it",—"We use a sand a triple A or something like that." Mr. McKee then said, "Does it contain silica?" to which Mr. Synck replied "Yes sir, it does."

Mr. McKee's wages were thirty-five dollars a week during his employment as a molder.

Plaintiff called as expert witnesses, five physicians, viz: Doctors Caylor, Long, Laboe, Snow and Huercamp.

Doctor Caylor, over the objection of the defendant that he was disqualified to testify by reason of the fact that he had attended Mr. McKee in his professional capacity, testified that from his reading of the X-rays, McKee had some type of silicosis, some kind of pneumononiosis; he couldn't say from the finding, that it was silicosis,

that it might have been due to asbestosis or that it might have been due to a number of things. He further testified that in his opinion McKee had silicosis. Later on in his testimony he said that tuberculosis and silicosis occur in combination very commonly, and you get your silicosis first, then you will subsequently develope tuberculosis, so that to say that this thing is separate, that this man had no tuberculosis, I don't think you can say that, and that it was possible that McKee had some tuberculosis, and that he didn't rule tuberculosis out of his case.

Doctor Long, over the objection of the defendant, said that in his judgment the appearance of the films were typical of silicosis, particularly when taken with the history of the man. He further stated that he was of the opinion that silicosis is followed, in a very great number of cases, by tuberculosis, but that he could find no positive evidence of tuberculosis in the films. A portion of his testimony is as follows:

"Q. By the way, doctor, what do you mean by exposure to dust?
A. Working or being in a place where the air contains the dust.
Q. What are the harmful sizes of the dust? Is the dust that you can see harmful, and of itself?
A. It might be if it contained the irritating—it depends on what kind of dust it is. If it contains silica it would be harmful.
Q. What size of silica is harmful?
A. Oh. I would say about—I can't state accurately but less than a—say, about ten microns.
Q. What is a micron?
A. A thousandeth of a millimeter."

The witness then reduced the metric figure to inches which gives

a figure of 1/25,000 of an inch as the size of a micron. He stated he was unable to give the size of the particle that would be most apt to produce the condition of silicosis, although he did state again that a man could not get silicosis unless he was exposed to dust containing silica in a dangerous amount.

He further testified, on the basis of a hypothetical question and from his examination of the films, he would make a diagnosis of silicosis, and that silicosis itself caused death. That the film Exhibit H, which was admitted over the objection of defendant, showed it to be silicosis in an advanced stage, and that it was possible that death might result within a period of six months.

He further testified that by means of post mortem examination it could have been definitely determined whether or not McKee died of silicosis.

He further testified that recognition and chance to control silicosis is a very recent thing and that it might be said that very little had been done before 1930, and that the way had been pointed out by men in South Africa and that they, the men in South Africa, are the men most quoted and the world's authority on the subject.

Doctor Snow testified, in response to a hypothetical question, that in his judgment a man such as described in the question, and from an examination of the films, was suffering from silicosis, complicated with tuberculosis.

He further testified that silicosis is produced primarily and exclusively by the free silica in the air that is breathed; that particles of free silica that produce the condition of silicosis are microscopic in size, and that the minimum number of microns of free silica in a cubic foot of air which consti-

tutes a dangerous exposure, as agreed by everyone, must be over five million, and, as claimed by some, must be over ten million; and that the rule is it must be over five million particles and that such particles must contain from a quarter to a third of free silica, and that it is not the dust you see that does the damage, it is the microscopic particles that affect the lungs. Doctor Snow further testified that there was definite evidence of tuberculosis in the films and that it would be impossible to state whether silicosis or tuberculosis existed first.

Doctor Huerkamp who attended Mr. McKee in his last illness, was called but was not permitted, under the privilege rule, to testify at any length. He did testify, however, that silicosis was a disease that had been diagnosed as such, comparatively recently and that he would say within the last ten years.

The defendant offered no evidence with the exception of Exhibits 1, 2, 3 and 4, the latter three being readings of the X-ray plate marked Plaintiff's Exhibits B, C, D, E, F and G, made at the Lima District Tuberculosis Hospital, reflecting that McKee had tuberculosis.

Except as may be inferred from the above facts in evidence, the cause of the death of plaintiff's decedent is not shown.

No evidence of a dust count of the air in its foundry was introduced. No analysis of either the molding sand or parting compound was shown. There was no showing that any other grey iron foundry in the vicinity of defendant's plant, or at any other place, used masks or respirators in molding operations, or except as may be inferred that such masks were available or practical for foundry use. There is no evidence that defendant ever

knew of silicosis or its causes.

The defendant-appellant assigns errors in the following particulars:

1. The common pleas court erred in the admission of evidence offered by plaintiff-appellee, to which defendant-appellant at the time objected.

(a) Improper hypothetical questions were propounded by counsel for plaintiff.

(b) The question submitted to Dr. Caylor was improper in that it called for the opinion of the witness.

(c) The testimony of Dr. Caylor was not admissible.

(d) Plaintiff's Exhibit H was improperly admitted.

2. Misconduct on the part of attorneys for plaintiff-appellee in that they constantly and repeatedly throughout the entire course of the trial, propounded to witnesses called on behalf of plaintiff-appellee, leading questions which put the answers into the mouths of said witnesses to such an extent as to show a set purpose on the part of said attorneys so to do.

3. The common pleas court erred in overruling the motion of defendant at the close of the testimony of plaintiff-appellee, to withdraw the case from the jury and render a verdict for defendant-appellant.

4. The common pleas court erred in overruling the motion of defendant-appellant to direct a verdict for defendant-appellant at the close of the testimony of plaintiff-appellee.

5. The common pleas court erred in overruling the motion of defendant-appellant made at the close of all the evidence, to take the case from the jury and render a judgment in favor of defendant-appellant.

6. The common pleas court erred in overruling the motion of defendant-appellant to direct a verdict for defendant-appellant at the close of all the evidence in the case.

Assignments numbers 3, 4, 5 and 6 are argued together in defendant-appellant's brief, under seven sub-headings as follows:

(a) Plaintiff failed to show that decedent died of silicosis.

(b) There is no evidence of exposure of the decedent to silica dust in a harmful amount.

(c) No violation of any specific statute or order or regulation of the industrial commission was shown.

(d) No showing that masks or respirators were used or available.

(e) Plaintiff did not show that decedent was ignorant of silicosis or the effect of dust.

(f) There is no evidence that the defendant knew of silicosis, its cause or effect.

(g) Plaintiff cannot maintain action because decedent's claim was barred.

7. The common pleas court erred in refusing to give to the jury written special request number one submitted by defendant-appellant before argument.

8. (a) The trial court committed prejudicial error by instructing the jury that the violation of §§871-15, 871-16 and 6330-1 GC, or any of them, would constitute negligence per se, or negligence in and of itself.

(b) The trial court erred in instructing the jury on §60 of the Foundry Code.

(c) The trial court committed error in its charge to the jury by directing the jury's attention, in the final paragraphs of its charge, to the importance of its verdict to the widow and children of plaintiff's decedent.

There are some additional assignments of error which are not argued in the brief and will therefore not be considered.

The assignments of error, except as hereafter noted, will be considered in the order mentioned.

1. (a) Improper hypothetical questions were propounded by counsel for plaintiff.

Under this assignment of error the defendant contends that certain hypothetical questions propounded to Doctors Caylor, Long and Laboe, set forth in the brief, were improperly admitted because they did not comprehend a statement of facts reflecting analyses of the molding sand and the parting compounds, as to the amount and character of the silica, if any, present, and the amount of free silica of the dangerous size present in the air in the foundry.

The defendant-appellant further contends that said hypothetical questions were improperly admitted because there is no evidence in the record as to the number of molds made by the decedent in the course of his daily work, nor as to the amount of metal poured by him, some of the questions propounded assuming as a fact, the number of pounds of metal poured and the number of molds made. It is further contended by the defendant-appellant that in the question submitted to Doctor Caylor, no reference was made to the matter of ventilation, namely, the evidence of windows, the manner of their construction and the use of such windows, made by men in the foundry, and that the question does not purport to give the whole history of the man because the question says: "Assuming as a part of the history of the case, that this man had been following the pursuit of a molder in a foundry, where he came in contact with molding sand and parting compound for a period of from fifteen to eighteen years", and in that it did not state the work the decedent did and the conditions under which the work was performed.

Appellant further contends that in the question asked of Doctor Laboe, the size of the foundry was stated to be 60 to 80 feet, one witness testifying that his estimate of the foundry was 60 by 80 feet, and another testifying that the foundry was 80 x 100 feet.

Further objection was made to this question in that counsel stated that the weight of the material poured was from fifeen hundred to eighteen hundred pounds per day, where there was evidence of the weight of the metal as low as eight hundred pounds per day, and in that the question does not truly represent the facts in another particular in that counsel failed to include in the question the fact that each molder controlled the window of his own floor.

Further objection was made to the question submitted to Doctor Snow, in that it is said to contain an assumption of fact which is not in accord with the testimony introduced by plaintiff, in that it is stated that it was to be assumed that the molding sand and parting material were mixed together and used continually, whereas there was testimony to the effect that all the sand was taken up and new sand introduced two or three times a year.

Further objection was made to this question on the ground that the individual work done by the decedent, as the basis of the question, was ignored, and the fact that the windows were under the control of the individual molder was omitted.

In Webster's New International Dictionary, Second Edition, silica

is defined as follows: "Chem. Silicon dioxide or silicic anhydride, SiO2, occurring naturally in crystaline form as quartz tridymite, etc.. and in amorphous form as opal. Sand is impure silica."

In the same work, sand is defined: "1. a. Loose material consisting of small but easily distinguishable grains (most commonly of quartz) resulting from the disintegration of rocks."

The contrary not appearing, it is presumed that the word "sand", as it appears in the testimony in this case, was used in its common, ordinary sense as meaning impure silica consisting of small but distinguishable grains (most commonly of quartz) resulting from the disintegration of rocks.

In the same work, "silicosis" is defined as "A form of pneumonocosis occurring in stone cutters, caused by the inhalation of silica or quartz dust."

The existence of this disease, as above defined, has been recognized for many years under the common appellation of "Stone cutters consumption". However, it appears from the evidence in this case that it is only recently, and probably within the last ten years, that it has been recognized as an occupational disease to which persons other than stone cutters may be subject by reason of their inhalation of silicate or quartz dust.

All of the hypothetical questions to which the defendant has objected were wholly or partially predicated upon facts in evidence tending to show that by reason of the nature of decedent's employment as a molder in an iron foundry he would, in the course thereof, inhale the dust of molding sand that is impure silica consisting of small but easily distinguishable grains (most commonly of quartz) resulting from the disintegration of rocks, and upon one or more X-

ray pictures in evidence tending to show the condition of the decedent's lungs at one or more times following his exposure to such inhalation, and preceding his death. Such facts and such X-ray picture or pictures referred to in each question constituted a sufficient predicate for the question and a sufficient basis for the opinion asked, as they comprehended both the fact and effect of the inhalation of silica, and the witness could determine from the fact and effect whether the decedent had inhaled amounts of free silica of such size as to cause silicosis.

It was therefore not essential that in such questions, facts should have been detailed showing analysis of the molding sand or of the parting compounds or of the amount and character of the dangerous size of free silica present in the air of the foundry. Consequently the general objections of the appellant to these questions are without basis.

It was admitted in the pleadings and it also appears from the evidence that decedent was employed as a molder in defendant's foundry, and there is testimony describing generally the work done by molders in the foundry, and the number of molds made by each molder and the amount of metal poured by each molder in the course of his daily work. And there is testimony by the witness Weining that he had worked in the same room and same section of the room as decedent, stating generally the work done by him and the amount of metal handled by each molder, and further stating that decedent performed work similar to his work and did as much work as he did.

This evidence tended to prove the number of molds made by the decedent in the course of his daily

work and the amount of metal poured by him as being the same as assumed in the question propounded, and was a sufficient basis for the facts assumed with reference thereto in the hypothetical question.

The failure to include in the hypothetical question propounded to Doctor Caylor, facts in evidence as to windows and the manner of their construction and the use made thereof by the men in the foundry, was immaterial as sufficient facts were detailed, as hereinbefore mentioned, to show the fact of inhalation by the decedent, of silica dust, regardless of the ventilation of the foundry room, and the X-ray picture referred to and submitted to the witness for consideration as one of the facts, disclosed the effect of such inhalation.

The hypothetical question submitted to Doctor Long was not defective in directing him to assume as a part of the history of the case, certain facts in evidence, and in not detailing other facts in evidence, as the facts he was directed to assume in connection with his study of the pictures, constituted a sufficient predicate for the question and a sufficent basis for the answer, without detailing other facts, as appears from our discussion of the general objection to the hypothetical questions.

The appellant contends that the hypothetical question asked of Doctor Laboe is defective in that the size of the foundry was stated to be sixty to eighty feet.

One witness testified that his estimate of the size of the foundry was sixty by eighty feet, while another witness testified that it was eighty by one hundred feet.

The evidence of the first witness fairly and reasonably tends to establish the existence of the fact assumed in the question, which as against this objection, constituted

the question a proper question, for it is not necessary, in a hypothetical question, to include therein all conflicting statements made by various witnesses nor is it necessary that the hypothetical question contain a statement of the entire case.

The same answer applies to the objection made to the question upon the ground that certain of the witnesses testified to a different weight of metal being poured, than the weight stated in the question, testified to by one of the witnesses.

For the reason mentioned in our discussion of the objection to the questions propounded to Doctor Caylor, it was not essential to the propriety of the question, that the fact in evidence that each molder controlled the window of his own floor, be included.

In the question submitted to Doctor Snow, the individual work done by the decedent is sufficiently stated, and for the reason above mentioned, the omission from the question of the statement of the fact that the windows were under the control of the individual molders was not material.

In this question the assumed fact that the molding sand and parting materials were mixed together and used continually, varied slightly from the facts in evidence, as there is the testimony of one witness to the effect that all the sand was taken up and new sand introduced two or three times a year. This variance did not materially affect the general purport of the question and therefore was not prejudicially erroneous.

(b). The question submitted to Doctor Caylor was improper in that it called for the opinion of the witness.

The question submitted to Doc-

tor Caylor starts as follows: "Taking these facts as true, that Ray McKee died in January of 1938" * * and concludes with these words: "taking these facts as true, as to what was your opinion as to the disease he had?"

It is contended by the appellant that while an expert witness may answer hypothetical questions which propound a similar case with the same conditions, he is not permitted to express an opinion as to the merits of the particular controversy, and that this question had the effect of permitting Doctor Caylor to express an opinion as to the merits of the controversy.

If a similar case had been propounded and similarly answered, the jury, upon finding the testimony credible, would necessarily have inferred from the question and answer, that the decedent would have been similarly affected, as no other inference would have been possible. Consequently the effect of the question and answer would have been the same whether the question was propounded as it was, or propounded upon the hypothesis of a similar case, one being the direct and the other the indirect method of attaining the same result. As a general rule, that which is proper if ▮▮▮ done indirectly is proper if done directly. We therefore conclude that the submission of this question as propounded was not erroneous.

(c) The testimony of Doctor Caylor was not admissible.

The evidence shows that Ray McKee submitted himself to Doctor Caylor for a physical examination. Some of the testimony of Doctor Caylor is based partially upon the conclusions arrived at by him from such physical examination.

It was admitted over the objection of the defendant to the effect that under the provisions of §11494 GC, the witness, by reason of the relationship of physician and patient existing between him and decedent at the time of such examination, was precluded from testifying as to the conclusions reached by him from such examination.

The following are the pertinent provisions of §11494, GC, to wit:

"The following persons shall not testify in certain respects: a physician, concerning a communication made to him by his patient in that relation. * *

"1. * * physician may testify by the express consent of the patient; and if the * * * patient voluntarily testifies, the * * * physician may be compelled to testify upon the same subject."

In the case of **Ausdenmoore et al v Holzbach, 89 Oh St 381,** the Supreme Court, considering the provisions of the section mentioned, held that "communication by the patient to the physician may be not only by word of mouth but also by exhibiting the body or any part thereof to the physician for his opinion, examination or diagnosis, and that that sort of communication is quite as clearly within the statutes as a communication by word of mouth."

Under this holding which has not been overruled, the submission by the decedent to a physical examination by Doctor Caylor constituted a communication, ▮▮▮ within the meaning of the section mentioned and within the inhibition of the section mentioned.

The statute expressly provides only two exceptions to the inhibition aganst testifying, the first that the physician may testify with

the express consent of the patient, and the second that the physician may testify if the patient voluntarily testifies.

There are no facts in the present case reflecting the existence of either of the exceptions mentioned.

The Supreme Court, in the case of Swetland v Miles, 101 Oh St 501, held that the statutory enumeration of exceptions to the inhibition are exclusive, and following the decision in this case it was definitely held in the case of Parsky v Pierstorff, 63 Oh St 503, that the right of the patient to waive the protection given to him under §11494 GC, relating to privileged communications between physician and patient, does not survive to his administrator and it is incompetent for the administrator to offer the testimony of the physician of his decedent, as to communications made to him in his capacity as a physician, in a wrongful death action.

In the case of Industrial Commission v Warnecke, 131 Oh St 140, it was held that in an action by a widow to recover compensation under the workmen's compensation act for the death of her husband resulting from injuries sustained by him in the course of his employment, the testmony of the physician who attended decedent in his illness resulting from such injuries, as to knowledge and information gained by such physician in his professional capacity, relating to decedent's physical condition, may be admitted in evidence where the widow waived the statutory physician-patient privilege.

Much of the reasoning appearing in the opinon in this case would indicate that the decision in the case of Swetland v Miles, 101 Oh St 501, should be overruled, and that representatives of deceased persons should have the right under the statute to waive the privilege, but the decision in the Miles case is not overruled and the court carefully restricts its holding to representatives of deceased workmen in workmen's compensation cases.

If not precluded by the decisions mentioned, the writer of this opinion would hold that such waiver might be made by the representatives of deceased patients in all cases. But being precluded by the decisions mentioned, the writer of this opinion joins with the other members of the court in holding that the privilege could not be waived by the plaintiff administratrix in the instant case, and that the admission of the testimony above referred to was erroneous, requiring reversal of the judgment.

(d) Plaintiff's Exhibit H was improperly admitted.

A perusal of the evidence discloses that this exhibit was identified by Doctor Caylor as an X-ray picture made in his presence by an X-ray technician. He also testified to the position of the patient in relation to the X-ray machine at the time the picture was taken. Similar testimony is given by Mrs. McKee. There is no evidence showing the angle of view, length of time of exposure and accuracy of the X-ray machine.

The evidence of Doctor Caylor and Mrs. McKee was sufficient to authorize the submission of the exhibit in evidence.

The matters of angle of view, length of time of exposure and accuracy of the X-ray machine go to the weight and not to the admissibility of the exhibit in evidence.

In the case of Lake Shore Power Company v Meyer, 51 Oh Ap 534, which is relied on by the appellant

as requiring angle of view, length of time of exposure and accuracy of X-ray machine in addition to identification of the picture and postion of the subject when the exposure was taken, as a proper foundation for the admission of X-ray pictures in evidence, the picture was not identified, which alone constituted sufficient ground for the holding that it was improperly admitted in evidence.

2. Misconduct on the part of attorneys for plaintiff-appellee in that they consistently and repeatedly throughout the entire course of the trial, propounded to witnesses called on behalf of plaintiff-appellee, leading questions which put the answers into the mouths of said witnesses to such an extent as to show a studied purpose on the part of said attorneys so to do.

A careful reading of the record in this case discloses that this claim of error is wholly without foundation.

3, 4, 5 and 6, Assignments of Error.
(a)   Plaintiff failed to show that decedent died of silicosis.

The trial court, by reason of the provisions of §11494 GC, hereinbefore commented upon, properly excluded the testimony of the physician in attendance upon the decedent prior to and at the time of his death, and there is no evidence as to the cause of decedent's death other than that which may be inferred from the testimony of the physicians who were called as expert witnesses in the case.

These physicians testified generally that in their opinion the decedent was suffering from silicosis, and that silicosis would cause death. One of them further testified that the disease, as reflected by the X-ray pictures, would cause death in six months from the time the X-ray picture designated as Exhibit H was taken. The death occurred approximately within six months of the time the picture was taken.

A reasonable inference could be drawn from these facts in evidence, that decedent's death was caused by silicosis, and consequently this assignment of error is without merit.

(b)   There is no evidence of exposure of decedent to silica dust in a harmful amount.

We have discussed the evidence which is determinative of this question, under assignment of error number one, subdivision 1-a, holding that certain facts in evidence, detailed in the hypothetical questions, and the X-ray picture or pictures referred to in each question, comprehended both the fact and effect of the inhalation of silica. The answers of the experts to these questions constituted evidence of the further fact that decedent had been exposed to and inhaled amounts of free silica of such size as to cause silicosis. This assignment of error is therefore without merit.

(c)   No violation of any specific statute or order or regulation of the Industrial Commission was shown.

This assignment of error necessitates a consideration of the provisions of §§871-15, 871-16 GC, subdivisions 7, and 11 of §§871-13, 6330-1, and Rule 7 of the Code of Specific Requirements in Foundries and Core Rooms, effective from January 1, 1924, to May 1, 1931, and §60 of the Code of Specific

Safety Requirements Covering Operations in and Conditions of Foundries, effective since May 1, 1931, which are as follows:

"Sec. 871-15. Employer required to protect the life, health and safety of employes. Every employer shall furnish employment which shall be safe for the employes therein, and shall furnish a place of employment which shall be safe for the employes therein, and for frequenters thereof, and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes, follow and obey orders and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes and frequenters."

"Sec. 871-16. Places of employment must be safe and provided with safety devices. No employer shall require, permit or suffer any employe to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employes or frequenters; and no such employer or other person shall hereafter construct or occupy or maintain any place of employment that is not safe."

"Sec. 871-13. (7) The term 'order', shall mean and include any decision, rule, regulation, direction, requirement, or standard of the commission, or any other determination arrived at or decision made by such commission."

"Sec. 871-13. (11) The terms 'safe' and 'safety', as applied to any employment or a place of employment shall mean such freedom from danger to the life, health, safety or welfare of employes or frequenters as the nature of the employment will reasonably permit, including requirements as to the hours of labor with relation to the health and welfare of employes."

"Sec. 6330-1. General duties of employers. Every employer shall, without cost to the employes, provide such reasonably effective devices, means and methods as shall be prescribed by the industrial commission of Ohio, to prevent the contraction by its employes of illness or disease incident to the work or process in which such employes are engaged."

"Rule 7, Code of Specific Requirements in Foundries and Core Rooms, effective from January 1, 1924 to May 1, 1931. "Where smoke, steam, gasses or dust arising from any of the operations of the foundry are dangerous to health or eyes, and where a natural circulation of air does not carry off such smoke, steam, gasses or dust, there shall be installed and operated hoods, ventilators, fans or other mechanical means of ventilation."

"Sec. 60, Code of Specific Requirements covering operations in and conditions of foundries, effective since May 1, 1931.

"Where smoke, steam, gasses or dust arising from any of the operations in the foundry are injurious to health or eyes and where a natural circulation of air does not carry off such smoke, steam, gasses or dust, there shall be installed and operated, hoods, ventilators, fans or other means of ventilation of sufficient capacity to do so. Four air changes an hour

shall be considered adequate ventilation."

As hereinbefore mentioned there is evidence tending to prove that silica dust arose and was prevalent in the foundry room from the operations carried on therein, which was not carried away by the natural circulation of air, and which was of such a character as to be injurious to health; and that the decedent in the course of his employment inhaled a sufficient quantity thereof to detrimentally affect his health and cause silicosis to develope, resulting in his death.

There is also evidence tending to prove that there were not installed and operated in said foundry room, hoods, ventilators, fans or other mechanical means of ventilation or other means of ventilation of sufficient capacity to do so, and that there were not four air changes an hour in such foundry.

This evidence tends to prove a violation of the provisions mentioned.

Whether such provisions constitute specific requirements will be discussed under assignment of error number eight, it being sufficient for the purpose of the assignment of error under consideration to state that if the violation of any of such provisions does not constitute negligence per se, it does constitute evidence of negligence sufficient to require submission of the issue of defendant's negligence to the jury.

This assignment of error is therefore without merit.

(d) No showing that masks or respirators were in use or available.

One of the specifications of negligence pleaded in the petition is the failure of defendant to provide decedent with a safety device to be worn over his mouth and nose while performing the duties of his employment, to prevent his inhalation of dust.

In its answer the defendant admitted that such a device was not furnished by it but averred that such devices were not used in foundries similar to that of defendant and that efficient respirators were not available.

There is no evidence tending to prove the use of respirators in foundries similar to defendant's foundry or as to the availability of efficient respirators for the use of employees in such foundries.

The issue of defendant's negligence in the respect mentioned was submittd to the jury, and it is the contention of the defendant that the court erred in submitting such issue, in the absence of evidence of the character mentioned.

In Webster's International Dictionary, Second Edition, "respirator is defined as a device, as of gauze or wire, covering the mouth or nose to prevent the inhalation of noxious substances such as dust or smoke."

Being used for the purpose mentioned, a respirator is a safety device.

There are no statutes specifically requiring that respirators be furnished to or used by employees in foundries of the character in which decedent was employed, and prior to May 1, 1931, there were no orders promulgated by the Industrial Commission or other public body or official pursuant to statutory authority requiring the furnishing or use of respirators in foundries of the character mentioned.

However, the Department of Industrial Relations and Industrial Commission of the State of Ohio, on February 14, 1931, adopted and issued a Code of Specific Safety Requirements Covering Operations

of and Conditions in Foundries, which became effective on May 1, 1931, and has ever since been in effect, making provision for the wearing of suitable respirators by employees of foundries for their protection under certain conditions.

The safety requirement pertinent to the instant case is that appearing in §56 of said Code, reading as follows: "When the dust arising from cleaning operations is liable to cause injury to the health of employees they shall wear suitable respirators."

Sub-section eleven of §3 of said Safety Requirements requires that: "The term 'suitable' when used herein shall mean fitting and capable of being applied or put into use under the conditions of construction, installation or the operation employed."

A respirator being a safety device, the following provisions of the Code are also applicable:

"Sec. 4. The safety devices herein required shall be of such material and construction as will provide protection to employees engaged in foundry operations."

"Sec. 5. Except as otherwise provided in this code, the employer shall furnish the safety devices herein required for the protection of employees. (See §§6330-1, 871-15, 871-16, 871-17, 871-43, 871-44 GC and §35 Art. II Const. page 3 of this code.)"

"Sec. 6. Every employee in every foundry shall use the safety devices furnished for his protection. (See §§871-16, 871-43, 871-44 GC, page 3 of this code.)"

The foregoing section and subsections all constitute orders as the term is defined in §871-13 GC, and used in §§871-15 and 871-16 GC, prescribed by the Industrial Commission pursuant to the provisions of §6330-1 GC.

The terms "safe" and "safety" as applied to any employment or place of employment, in §§871-15 and 871-16, GC, are used in the sense these terms are defined in §871-13 GC, that is, "such freedom from danger to life, health, safety or welfare of employees or frequenters as the nature of the employment will reasonably permit."

Sec. 6330-1 GC, is in pari materia with §§871-13, 871-14, 871-15 GC, and must be construed therewith, and so construed, the "reasonably effective devices, means and methods" the industrial commission is thereby authorized to prescribe, are such as will provide such freedom from danger to life, health, safety or welfare of employees or frequenters as the nature of the employment will reasonably permit.

The presumption that public officers in the performance of their duties have conformed to and complied with the requirements of law, is applicable to the action of the Industrial Commission in promulgating the Code hereinbefore mentioned, and it is therefore presumed that the devices, means and methods therein prescribed are reasonably effective for the statutory purposes prescribed and are such as will provide such freedom from danger to the life, health, safety or welfare of employees or frequenters as the nature of the employment will reasonably permit.

This presumption, however, is rebuttable.

The violation of any of the safety requirments of said Code constitutes evidence of failure to exercise ordinary care on the part of the defendant employer, which the

jury could take into consideration, with all the other evidence appearing upon the subject, as more fully set forth in the discussion of sub-division (b) of assignment of error number eight.

The evidence in this case tends to prove that the decedent, in the course of his employment, was exposed to the inhalation of silica dust of a character and in quantities harmful to health, and that some of this dust was carried into the foundry room where decedent was employed, from an adjoining room where cleaning operations were performed, by the circulation of currents of air through the door opening between the two rooms, and arose from cleaning operations.

This evidence, under the Foundry Code and General Code sections mentioned, together with the presumption referred to, and the other evidence in the case, warranted submission to the jury of the issue of defendant's negligence in failing to furnish a respirator for the use of decedent, as specified in the petition, so .the court did not err in submitting this issue.

However, while the failure of the court so to do is not urged as a ground of error, it may be well to state that in submitting this issue the court should have separately stated and defined the issues of fact and law involved, and explained the application of the Foundry Code and General Code sections above referred to, and the presumption mentioned.

(e)  Plaintiff did not show that decedent was ignorant of silicosis or the effects of dust.

It was alleged in the amended petition that the decedent was exposed to silica dust in an amount harmful to health, which condition

was unknown to him. There is no evidence tending to prove that such condition was unknown to him.

It is contended by the defendant that failure of proof in the respect mentioned is fatal to plaintiff's case. As supporting this contention, defendant relies upon the case of **Heijnicki** v **The Willys-Overland Company, 105 Oh St 644,** where the Supreme Court, in a per curiam opinion, held:

"The plaintiff below sued to recover damages for injuries which he claims to have sustained as a result of breathing dust and fumes of brass and zinc while engaged as an employe of defendant. It is necessary only to observe that no evidence whatever was adduced showing, or tending to show, that plaintiff did not know of the conditions surrounding his employment and the probable effect thereof upon him if he continued in such employment. In view of the failure to meet such requirements and conform to the rule of long standing and frequent application stated in **Coal and Car Co.** v **Norman, 49 Oh St 598,** it is unnecessary to consider other questions presented by the record. That failure furnished ample ground for the action of the trial court in directing a verdict in favor of the defendant and the affirmance by the court of appeals."

The rule stated in the per curiam is unquestionably the rule in effect under the common law doctrine of assumption of risk. However, such common law doctrine has been modified by the provisions of **Chapter 17** of **Title 2, Part Second, GC,** the rule at common law stated by the Supreme Court in its per curiam opinion being modified by the provisions of §6245 GC, one of the sections ap-

pearing in said chapter, which, insofar as cases of the character of the instant case are concerned, in substance provides:

"That in all cases brought to recover from an employer for personal injuries suffered by his employe, or for death resulting to such employe from such personal injuries while in the employ of such employer, arising from the negligence of such employer, when it shall appear that the injury or death was caused in whole or in part by any of the following, to wit:

a. The neglect of such employer in failing to properly furnish, maintain or construct any plant in any way connected with or in any way used in the business of the employer, in any manner required by statute or law of the state or United States;

b. Any defective or unsafe condition in the works, or plant in any way connected with or in any way used in the business, of the employer;

the fact that such employe continued in said employment with knowledge of such negligent omission or want of care or such defective or unsafe condition shall not be a defense unless by the terms of his employment it is expressly made the duty of such employe to report such neglect or such defective or unsafe condition to the employer and the evidence discloses that such employe failed to report, and that the employer was not otherwise possessed of knowledge of such negligent, unsafe or defective condition."

The decision of the Supreme Court above mentioned was rendered subsequent to the enactment of the statutory provisions mentioned but appears to be based upon a state of facts to which the common law doctrine of assumption of risk was applicable it not appearing from the per curiam that facts were either pleaded or in evidence bringing the case within the provisions of the sections of the statute mentioned. The decisions therefore has no application to cases in which the common law doctrine as modified by statute is involved.

In the instant case facts are pleaded and evidence has been introduced on behalf of plaintiff showing that the decedent employe received a personal injury, to wit, an impairment of the soundness of his health, resulting in his death, by reason of an unsafe condition in the plant of the employer defendant.

This brings the case clearly within the statutory provisions mentioned, and under the statutory provisions the fact that such employe continued in said employment with knowledge of such unsafe condition, does not constitute a defense, it not appearing that by the terms of his employment it was expressly made the duty of such employe to report such unsafe condition to the employer and that such employe failed so to report, and that the employer was not otherwise possessed of knowledge of such unsafe condition.

As upon the facts of the instant case, under the statutory provision mentioned knowledge of the unsafe condition by the employe did not constitute a defense, it was unnecessary for the plaintiff either to plead or prove want of knowledge on the part of the decedent, of the unsafe conditions surrounding his employment and the probable effect thereof upon him if he continued in such employment.

This contention of error is also without merit.

(f) There is no evidence that the defendant knew of silicosis, its cause or effect.

The last paragraph on the first page of plaintiff's amended petition reads as follows:

"That the deceased, Ray McKee, was exposed to silica dust (silicon dioxide). That in the course of decedent's work, the atmosphere was filled with silica in an amount harmful to health. That this condition was known, or should have been known, by the defendant company, but was unknown to the plaintiff's decedent."

Part of the next to the last paragraph of the second page of the amended petition reads as follows:

"That said defendant company, its officers and foreman, superior to this plaintiff's decedent, failed to inform and advise him and did conceal and intend to conceal the dangerous and injurious silica which caused the injury and death of said decedent."

All of this, except the employment and death, is denied in the defendant's answer to the amended petition.

There is no evidence tending to prove that the condition charged in the first paragraph above quoted, was known or should have been known by the defendant company, but was unknown to plaintiff's decedent, or of concealment of said condition as charged in the second paragraph mentioned.

Under the common law doctrine of assumption of risk it would have been necessary for the plaintiff to have pleaded and proved that the condition charged in the first above quoted paragraph, was known or should have been known by the defendant company but was unknown to plaintiff's decedent.

However, the common law doctrine in this respecst has been modified by the provisions of §6243 GC, the pertinent provisions of which, as applied to cases of the character of the instant case, are in substance as follows:

If the employe shall receive any personal injury by reason of any unsafe condition in any works or plant in any way connected with or in any way used in the business of the employer, such employer shall be deemed to have had knowledge of such defect, before and at the time such injury was sustained, and when the fact of such injury shall be made to appear upon trial in action brought by such employe or his personal legal representatives, against any such employer for damages, on account of such injury so received, the same shall be prima facie evidence of neglect on the part of such employer; but the employer may show by way of defense that such defect was not discoverable in the exercise of ordinary care.

There is evidence in the instant case that the employe received a personal injury by reason of an unsafe condition in the works or plant used in the business of the employer, bringing the case within the purview of the section last mentioned. And being within the purview of the section, the defendant employer is deemed to have had knowledge of such defect before and at the time such injury was so sustained, and the fact of such defect appearing upon the trial of the action, such unsafe condition is prima facie evidence of neglect on the part of such employer, the employer defendant having the right to show by way of defense that such defect was not discoverable in the exer-

cise of ordinary care.

It was therefore unnecessary upon the facts of this case for the plaintiff either to plead or prove knowledge or concealment of the unsafe condition by the defendant, or lack of knowledge thereof by plaintiff's decedent, want of knowledge on the part of defendant, if it existed, being a matter of defense within the limits prescribed. This contention of error is also without merit.

(g) Plaintiff cannot maintain action because decedent's claim was barred.

It is alleged in the petition, and the evidence tends to prove, that the decedent commencd work for the defendant company in 1918 and that he continued such employment until in the latter part of February, 1936, so that his exposure to the dust in the defendant's foundry ceased at that time. He died June 3, 1938, and this action was filed April 21, 1939.

The testimony of medical experts in the case tended to prove that ordinarily the development of silicosis is a slow process extending over a number of years.

Decedent did not, in his lifetime, institute any action against the defendant for the injuries upon which this action for wrongful death is predicated.

The following are the pertinent statutory provisions patterned after Lord Campbell's Act relating to liability in actions of this character, to wit:

Sec. 10509-166 GC, provides in part as follows:

"When the death of a person is caused by wrongful act, neglect or default, such as would have entitled the party injured to maintain an action and recover damages in respect thereof, when death had not ensued, the corporation which, or the person who would have been liable if death had not ensued * * * shall be liable to an action for damages, notwithstanding the death of the person injured. * * *"

Sec. 10509-167 GC provides in part as follows:

"Except as otherwise provided by law, every such action must be commenced within two years after the death of such deceased person."

The appellant contends that the right to maintain the action set forth in the present case is subject to the condition precedent that the decedent was capable of maintaining an action and recovering damages at the time immediately preceding death or at the time of injury.

As supporting this contention, appellant relies upon the decisions of the courts of other states in cases involving similar statutes patterned after Lord Campbell's Act. It also relies upon the decision of the circuit court of this district, in the case of **Solar Refining Company v Elliott, 15 O. C. C. 581**, involving a similar statute, wherein it is held:

"The limitation of an action under §6135 of the Revised Statutes, for causing death from wrongful act, and the right to maintain the action, is not affected by the lapse of time between the injury and the death unless recovery by the deceased person had not death ensued, is barred by the statute of limitations at the time of death."

The facts upon which the circuit court based its holding were not such as to require a decision of the question whether the recovery for wrongful death would have been barred if the right of action of decedent for his injury resulting in death had been barred by the statute of limitations at the time of his death, so that that part of the decision is purely obiter.

Subsequent to this decision it

has been definitely held by the supreme court and other courts of this state:

That the above quoted sections and §10509-167 GC, irrespective of the construction given to similar statutes by the courts of other states, give an independent right of action for the benefit of the persons named in §10509-167 GC, where death has resulted from the injuries, to recover for such pecuniary loss as they have sustained by the decease of the injured person, such right being subject to the condition that the act, neglect or default, is such as would have entitled such person to maintain an action and recover damages in respect thereof if death had not ensued.

That the right of action in the injured party, including the right surviving to his administrator by virtue of the provisions of §11235 GC, to bring such action notwithstanding his death, is distinct from the right of action conferred by §§10509-166 and 10509-167 GC, no part of either being embraced in the other. That one is for the wrong to the injured person and is confined to his personal loss and suffering before he died and the other is for the wrong to the beneficiaries and is confined to their pecuniary loss through his death. That the two actions, the survivor action and the death action, although prosecuted by the same personal representative, are not in the same right and hence a judgment obtained by him in one case is not a bar to recovery in the other. Mahoning Valley Ry. Co. v Van-Alstine, Admr. 77 Oh St 395; Cincinnati Traction Co. v Ginnochio, Admr., 87 Oh St 511; Wellstone Iron & Furnace Co. v Rheinhart, Admr., 108 Oh St 117; The May Company v Robinet, Admr., 120 Oh St 110.

It has been held that separate releases by husband and wife, of cause of action for personal injuries sustained by wife, executed before wife's death from injuries, do not constitute a bar to an action for the wrongful death, brought by administratrix for benefit of children. Phillips, Admrx. v Community Traction Company, 43 Oh Ap 483.

As the right of action conferred by §§10509-166 and 10509-167 GC, is distinct and independent from the right of action of the person injured and the administrator of the injured person to recover for his personal loss and suffering, the fact that the right of action of the injured person had been barred by the statute of limitations before he died, would not constitute a bar to the right of action of his administrator, under the provisions of §§10509-166 and 10509-167 GC, the only limitation to this cause of action being the limitation incorporated in §10509-167 GC, that "every such action must be commenced within two years after the death of such deceased person."

This contention of error is therefore without merit.

7. The common pleas court erred in refusing to give to the jury written special request number one, submitted by defendant-appellant before argument.

Special request number one constituted an attempted application to the facts of the case, of certain tests applicable to common law negligence, and ended with an instruction that unless the jury find that the plaintiff has shown by a preponderance of the evidence that the defendant in the operation of its foundry failed to exercise due or ordinary care under the circumstances above defined, they should find for the defendant.

The case, both upon the plead-

ings and upon the evidence, is predicated upon a violation of the provisions of certain statutes hereinbefore mentioned, and of certain regulations hereinbefore set forth, issued by the industrial commission pursuant to statutory authority, and presents a state of facts to which the tests prescribed in the instruction and applicable to ordinary negligence, are not applicable.

This assignment of error is therefore without merit.

8. (a) The trial court committed prejudicial error by instructing the jury that the violation of §§871-15, 871-16 and 6330-1 GC, or any of them, would constitute negligence per se, or negligence in and of itself.

The instruction complained of is as follows:

"It was the duty of the defendant company to exercise ordinary care for the safety and health of its employes and it was also the duty of the defendant company to follow and obey the following statutes of the State of Ohio:

"Sec. 871-15 GC provides that: 'Every employer shall furnish employment which shall be safe for the employes therein and shall furnish a place of employment which shall be safe for the employes and shall furnish and use safety devices as safeguards, and shall adopt and use methods and processes, follow and obey orders and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employes."

"Sec. 871-16 GC provides that: 'No employer shall require, permit or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and no employer shall fail or neglect to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees; and no such employer or other person shall hereafter construct or occupy or maintain any place of employment that is not safe.'

"Sec. 6330-1 GC provides that: 'Every employer shall, without cost to the employee, provide such reasonably effective devices, means and methods as shall be prescribed by the Industrial Commission of Ohio to prevent the contraction by its employees of illness or disease incident to the work or process in which such employees are engaged.'"

"You are instructed that a specific requirement of law in effect from January 1, 1924, made it the duty of the defendant 'where smoke, steam, gasses or dust arising from any of the operations of the foundry are dangerous to the health or eyes, and where a natural circulation of air does not carry off such smoke, steam, gasses or dust, there shall be installed and operated hoods, ventilators, fans or other mechanical means of ventilation.

"If the defendant knew or in the exercise of ordinary care should have known, that such condition existed in an amount and quality injurious to health, then the defendant would be under the duty to comply with it from and after that date.

"You are instructed that the violation of any of the above statutes by the defendant would constitute

negligence per se,—that is, negligence in and of itself or negligence as a matter of law,—providing said defendant knew or in the exercise of ordinary care should have known, that said laws were being violated by its officers, agents or servants."

It is appellant's contention that §§871-15 and 871-16 GC must be construed as setting forth only general rules of conduct and not specific rules, and that the violation of a general rule is not negligence per se.

In the case of **Shell v Dubois, Admr.,** 94 Oh St at page 93 it was held that the violation of a statute passed for the protection of the general public is negligence per se, and where such acts of negligence by a defendant is a direct and proximate cause of an injury not directly contributed to by the injured person, the defendant is liable.

In the opinion in this case, the court quoted with approval from the opinion in the case of **Variety Iron Company v Poak,** 89 Oh St 297, 310, as follows: "The plaintiff * * predicated his right of recovery upon the violation of the statute, which made it an absolute duty on the part of the employer to adopt certain measures to protect its employes. It was not for the jury to say whether a failure to comply was negligence. To use the language of the court of appeals: 'As no jury is allowed to say that which is not the law shall be the law, so they should not be permitted to say that which is the law is not the law.' "

The holding in the Shell case has been followed in many subsequent cases and is now the settled law of Ohio, and the rule established by this holding is the rule established by the great weight of authority in the courts of other states.

Subsequent to the decision in the Dubois case, the Supreme Court, in the case of **Heidle v Baldwin,** 118 Oh St 375, which was followed in the case of **Times Square Garage Company v Spencer,** 127 Oh St 77, and in the case of **Scott, Admrx. v Hi-Grade Food Products Corporation,** 131 Oh St 225, and other cases, has held that the violation of a statute passed for the protection of the general public, prescribing a general rule of conduct is not negligence in and of itself and does not as a matter of law constitute negligence.

In American Jurisprudence, Vol. 5, page 595, a rule similar to the rule adopted in the Dubois case, is set forth as the general rule, and the case of **Heidle v Baldwin** is the only case cited as supporting the apparent exception to the general rule that the violation of a statute prescribing a general rule of conduct is not negligence in and of itself.

In the case of **Swoboda v Brown,** 129 Oh St 513, it is held that the distinction between negligence and negligence per se is the means of ascertainment. The former must be found by the jury from the facts, the conditions and circumstances disclosed by the evidence; the latter is a violation of a specific requirement of law or ordinance, the only fact for determination by the jury being the commission or omission of the specific act inhibited or required.

It is further held that though the violation of the general provisions of §12603 GC, may not properly be designated negligence per se, an instruction that such violation constitutes negligence or failure to exercise ordinary care is not erroneous.

It therefore appears that while the violation of a statute prescribing a general rule of conduct for the protection of the public is not

technically negligence per se, a violation of such general rule of conduct constitutes negligence in that it is a failure to exercise ordinary care, so that no matter how the violation is designated, the result insofar as fixing liability is concerned is the same. And it would seem that the only practical difference is that where a statute of the character mentioned prescribes a specific requirement, a court should charge the words of the statute and instruct the jury that the violation of such specific requirement is negligence per se, while in a case where the statute prescribes a general rule of conduct, the court should, in addition to charging the words of the statute, explain the standard of conduct prescribed by the statute in such a manner that the jury may determine upon considering the facts and circumstances in the case, whether such statute has been violated, and should further charge that a violation of the provisions thereof constitutes neggence.

The three sections of the statutes charged in this case all prescribe general rules of conduct, and the violation of any of the provisions of these statutes does not technically constitute negligence per se, and the court erred in charging the jury that violation thereof constituted negligence per se. This error if not prejudicial in itself was rendered prejudicial by reason of the failure of the court to explain the standard of conduct prescribed by the statute in the manner set forth in the preceding paragraph, which it was the duty of the court to do whether requested or not.

Sec. 871-13 is part of the Act of which §§871-15 and 871-16 are parts, and the definitions therein contained, insofar as they are applicable to the facts in the case, should have been charged as explanatory of the standards of conduct prescribed.

As the place of employment and the employment were admitted in the pleadings, it was unnecessary to charge the definition of "place of employment", "employment", "employer", and "employe", but it was essential that the statutory definition of the term "order" should be given, and the statutory definitions of the terms "safe" and "safety" should also be given, in addition to the further explanation of the standards of care established by the statutory provisions.

The court should also have instructed the jury that the different rules prescribed by the Industrial Commission of Ohio, on January 1, 1924, and in 1931, were orders, within the meaning of §§871-15 and 871-16.

The clause appearing at the end of the quoted instruction, reading: "providing said defendant knew or in the exercise of ordinary care should have known that the said laws were being violated by its officers, agents or servants", is erroneous, as the test prescribed therein is wholly inapplicable as an employer as a matter of law is chargeable with knowledge of the acts of its officers, agents and servants in the ordinary course of their employment.

While it is not involved in a consideration of the assignments of error, we deem it proper to call attention to the fact that under the provisions of §6245-1 GC, the doctrine of comparative negligence is applicable to the facts in this case, and that the applicable provisions of §§6243 and 6245, hereinbefore mentioned, with appropriate explanation should also have been charged.

592

The error in charging that the violation of the sta- ▮▮▮▮▮▮▮ tutory provisions mentioned constituted negligence per se, requires reversal of the judgment.

(b) The trial court erred in instructing the jury on §60 of the Foundry Code.

Upon this assignment, the appellant contends that the instruction given was erroneous in that there were variances between the provisions of the Foundry Code in effect from 1924 to 1931 and the provisions in effect subsequent to 1931, and was erroneous for the further reason that there were not facts in evidence upon which such charge could be predicated.

In the applicable section of the Foundry Code becoming effective in 1924, the last clause reads: "There shall be installed and operated, hoods, ventilators, fans, or other mechanical means of ventilation", while in the section of the Foundry Code becoming effective in 1931, a corresponding clause reads: "There shall be installed and operated, hoods, ventilators, fans and other means of ventilation of sufficient capacity to do so". With an added provision that: "Four air changes an hour shall be considered adequate ventilation."

As the evidence tended to prove that there were neither "other mechanical means of ventilation, or other means of ventilation, and that there were not four air changes an hour", the ▮▮▮▮▮▮ error in failing to charge the provisions of both sections was not prejudicial, upon the facts in evidence.

The court incorrectly charged that the provisions ▮▮▮▮▮▮ of the Foundry Code constituted a specific requirement of law.

It was held in the case of Metz v Curtis Cartage Company, 132 Oh St 273, that a safety regulation such as the regulation in question, adopted by a public commission pursuant to authority conferred by statute, does not constitute a specific requirement of law the violation of which constitutes negligence per se, but that evidence of the violation thereof is admissible as bearing upon the question of ordinary care.

The court was therefore warranted in charging the provisions of the Foundry Code, but should have instructed the jury that a violation of its provisions constituted evidence of failure to exercise ordinary care on the part of the defendant, which the jury could take into consideration with all the other evidence bearing upon the subject. Sherman and Redfield on Negligence, Revised Edition, Vol. 1, page 40. Schumer v Caplin, 241 N. Y. 346; 150 N. E. 139.

The charge is therefore erroneous in the respects hereinbefore mentioned requiring reversal of the judgment.

(c) The trial court committed error in its charge to the jury by directing the jury's attention, in the final paragraph of its charge, to the importance of the verdict to the widow and children of the plaintiff's decedent.

An inspection of this part of the charge shows that the court likewise directed the attention of the jury to the fact that the verdict was also important to the defendant. Being fair to both, there is no error in the respect claimed.

For the errors in the admission of testimony, and in the general charge, hereinbefore mentioned, the judgment will be reversed at costs of appellee and the cause remanded for a new trial and further proceedings according to law.

KLINGER, PJ., & CROW, J., concur.